IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIAMOND RESIDENTIAL MORTGAGE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | No. 19-cv-06439 |
| v. | ) ) | Judge Andrea R. Wood |
| LIBERTY SURPLUS INSURANCE CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Diamond Residential Mortgage Corporation ("Diamond"), a mortgage loan provider, has sued its insurance carrier, Defendant Liberty Surplus Insurance Corporation ("Liberty"), for breach of contract. After a senior Diamond employee defrauded customers for his own financial benefit and submitted fraudulent loan applications, a state agency launched an investigation culminating in Diamond making a $1,275,000 settlement payment. Liberty denied Diamond coverage for the payment. Liberty now seeks dismissal of all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt No. 20.) For the reasons given below, Liberty's motion is granted.

### BACKGROUND

For the purposes of Liberty's motion to dismiss, the Court accepts as true the well-pleaded facts in the Complaint and views them in the light most favorable to Diamond. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826–27 (7th Cir. 2015). The Complaint alleges as follows.

Around March 2018, the Illinois Department of Financial and Professional Regulation ("IDFPR") began an investigation into Diamond's Springfield, Illinois branch office. (Compl. ¶ 12, Dkt. No. 1.) IDFPR concluded that Diamond's employees at the Springfield office had fraudulently originated loans and that Diamond had negligently supervised that office. (Consent Order at 2, Dkt. No. 1-1.) A branch manager had also diverted borrowers seeking home loan refinancing through Diamond to personal financial transactions with the branch manager. (*Id.*) In October 2018, Diamond and the IDFPR entered into a "Consent Order" under which Diamond's residential mortgage license was placed on probation for 36 months, Diamond agreed to pay $1,275,000 (of which the IDFPR retained $75,000 and transferred $1.2 million to the Illinois Attorney General's consumer trust account for a compensatory consumer claim process), and Diamond agreed to comply with various corrective actions. (*Id.* at 4–5.) Diamond also signed an "Assurance of Voluntary Compliance" with the Illinois Attorney General's Office, which provided, among other things, that the Attorney General would not bring certain claims against Diamond so long as Diamond made timely payments on the $1,275,000 settlement. (Assurance of Voluntary Compliance at 3, Dkt No. 1-1.)

Liberty insured Diamond through an Errors and Omissions Policy ("E&O Policy") and a Mortgage Bankers Fidelity Bond ("Bond"), both of which were in effect in March 2018. (Compl. ¶ 7.) On March 9, 2018, Diamond notified Liberty by email of a claim under the E&O Policy and a loss under the Bond. (*Id.* ¶¶ 7, 21–22.) Liberty acknowledged receipt of the notice on March 13, 2018 and paid $10,000 to Diamond for attorney's fees related to the investigation. (*Id.* ¶ 22.) But Liberty subsequently denied that the E&O Policy or the Bond provided any additional coverage to Diamond because the terms of the policies did not extend coverage to the loss and because of allegedly deficient notice from Diamond under the Bond. (*Id.* ¶¶ 8–9.)

Diamond's Complaint here contains two counts. Count One alleges that Liberty breached the E&O Policy by not paying for Diamond's damages, including its payment under the Consent Order, attorney's fees, and other damages. Count Two alleges that Liberty breached the Bond by not paying Diamond's damages under the Consent Order.

**DISCUSSION**

As no party has raised a choice of law issue in this diversity suit, the Court applies the law of the forum state, Illinois. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the Court need not accept a party's legal conclusions, and a party cannot defeat a motion to dismiss with "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The pleading standard does not require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

A breach of contract claim has four elements under Illinois law: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004). In addition, "[u]nder Illinois law, construction of insurance policies is a

3

question of law." *Keystone Consol. Indus., Inc. v. Emp'rs. Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) (citation omitted). As the Seventh Circuit has explained, the following principles govern interpretation of insurance contracts under Illinois law:

> [I]nsurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies. Illinois courts aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy. In doing so, they read the policy as a whole and consider the type of insurance purchased, the risks involved, and the overall purpose of the contract. If the policy language is unambiguous, courts apply it as written. Policy terms that limit an insurer's liability are liberally construed in favor of coverage, but only when they are ambiguous, or susceptible to more than one reasonable interpretation.

*Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011) (citations omitted). A court "will not search for ambiguity where there is none." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006).

## I. The E&O Policy

Liberty offers three reasons why the E&O Policy does not cover Diamond's loss: first, Diamond's loss does not meet the definition of a claim; second, fines and penalties are excluded from coverage; and third, claims brought by government agencies are excluded from coverage. The Court addresses each argument in turn.

### A. Coverage

Under Illinois law, the insured bears the initial burden to prove coverage in a coverage dispute; then, the insurer bears the burden of proving a limitation or exclusion. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). The E&O Policy only indemnifies Diamond for damages and claims expenses "resulting from Claims." (E&O Policy § 1(A)(1), Dkt. No. 1-1.) For purposes of the E&O Policy, a "Claim" is defined in relevant part as "a written demand for monetary relief" and "a civil action, suit or arbitration proceeding commenced by service of a

4

complaint or similar pleading." (*Id.* § 3(B).) The contract language is unambiguous, identifying a limited set of circumstances that constitute a Claim. But Diamond's Complaint does not include any facts supporting a reasonable inference that the IDFPR or the Attorney General ever presented Diamond with a written demand for monetary relief or initiated a civil action, suit or arbitration proceeding. Thus, the Court cannot reasonably infer that Liberty breached its obligations under the E&O Policy. Diamond does allege that, "[t]he demand made by the [IDFPR] and the action it filed as No.-2018-MBR-CD-01-b constitutes a 'Claim' as defined in Section III (B) of the E&O Policy." (Compl. ¶ 25.) But Diamond pleads a legal conclusion—that the IDFPR's actions created a Claim—without pleading the existence of a written demand for monetary relief or a civil action or arbitration proceeding. If, in fact, IDFPR made a written demand for monetary relief or brought such an action, Diamond must allege more specific facts for this Court to defer to its pleadings. *See Iqbal*, 556 U.S. at 678 (describing insufficiency of "mere conclusory statements" to withstand motion to dismiss (citation omitted)).

Further, Diamond does not adequately plead that its damages "resulted from" a Claim. Diamond appears to be attempting to plead around an explicit limitation in the policy, which excludes "Disciplinary Proceedings" from the definition of "Claims." (E&O Policy § 3(B).) The E&O Policy defines "Disciplinary Proceeding" as "any proceeding commenced by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct in the performance of Professional Services." (*Id.* § 3(E).) "Professional Services," in turn, are defined to include, among other things, loan origination. (*Id.* § 3(U).) These terms unambiguously establish that an investigatory proceeding regarding misconduct in loan origination constitutes a Disciplinary Proceeding.

5

Diamond acknowledges that the IDFPR's investigation was a Disciplinary Proceeding, but contends that (1) a Disciplinary Proceeding can transform into a Claim and the same facts can provide the basis for both a Disciplinary Proceeding and a Claim, and (2) the E&O Policy only limits liability for damages that "result from" a Disciplinary Proceeding, not those that "stem out" from or "arise out of" such a proceeding. However, the only well-pleaded facts before the Court indicate that Diamond's damages resulted from a Disciplinary Proceeding. To survive dismissal, Diamond must plead facts on which the Court could reasonably infer that Liberty breached its obligations under the E&O Policy, which requires that Diamond suffered damages "resulting from" a Claim. If Diamond had pleaded, for example, that the Attorney General also filed a civil suit against it, Diamond could have argued that its damages resulted not from a Disciplinary Proceeding but from a Claim. The parties then might have debated whether the damages "resulted from" the Disciplinary Proceeding, the lawsuit, or both. But to reach that question, Diamond must plead facts supporting an inference that its damages "resulted from" a Claim, and the Court cannot make this inference on Diamond's present Complaint.

### B. Exclusion of Fines and Penalties

Liberty next contends that Diamond's $1,275,000 payment to the IDFPR constitutes a civil fine or penalty and therefore is not covered by the E&O Policy, which covers only "Damages and Claims Expenses resulting from Claims." (E&O Policy § 1(A)(1).)

Under the E&O Policy, "Damages" are defined in relevant part as "judgments (inclusive of any pre- or post-judgment interest), awards or settlements negotiated with the approval of [Liberty]." (*Id.* § 3(D)(1).) However, civil and criminal fines and penalties are not considered Damages under the unambiguous language of the policy. (*Id.* § 3(D)(4)(ii).) And the exhibits

6

attached to Diamond's Complaint make clear that the payment at issue was a civil penalty.[1] First, the Consent Order states that the payment is "pursuant to Section 4-5(h)(5) of the [Residential Mortgage License] Act." (Consent Order at 4.) The referenced section of the statute allows the Commissioner of the IDFPR to impose penalties of up to $25,000 for each offense, or up to $75,000 for each offense involving fraud and other mortgage financing misconduct. 205 ILCS 635/4-5(h)(5). Importantly, that section does not allow the IDFPR to seek compensatory or remedial damages on behalf of harmed consumers; and Diamond does not explain how its payment could be compensatory or remedial when the agency it paid lacks such authority. *Id.* The Court is left to conclude that the payment at issue is a fine and a penalty, which excludes it from coverage under the E&O Policy. The Assurance of Voluntary Compliance supports the same conclusion, referring to the "***fine monies*** received from DIAMOND." (Assurance of Voluntary Compliance at 2 (emphasis added).)

    Illinois law treats policy exclusions as affirmative defenses in coverage disputes. *James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 386 (7th Cir. 2009) (citing *Raprager v. Allstate Ins. Co.*, 539 N.E.2d 787, 791–92 (Ill. App. Ct. 1989)). Generally, a pleading party need not anticipate affirmative defenses, but "[a] litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense." *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) ("If the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." (citations omitted)). Because the Consent Order attached to the Complaint establishes that Diamond's payment was a fine and a penalty, and does not allow the Court to reasonably infer any other conclusion, Diamond has

---

[1] The Consent Order was attached to the Complaint as an exhibit and is therefore a part of the pleading for all purposes. Fed. R. Civ. P. 10(c).

pleaded facts that allow Liberty to argue that the payment is excluded from coverage as a civil fine and penalty.

Diamond argues that its payment was not a fine because it went, in part, to a victim-compensation fund. But Diamond provides no support for this proposition, citing only a case that considered whether certain statutorily-authorized civil remedies were remedial or punitive in nature. *See Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 18 N.E.3d 884, 893 (Ill. 2014). Here, Diamond paid the IDFPR pursuant to a statutorily authorized fine not tethered to the actual loss suffered by the victims of Diamond's misconduct, indicating that the payment was a penalty and a fine. 205 ILCS 635/4-5(h)(5); *see also Goldfine*, 18 N.E.3d at 893 ("[A] statute is a 'penalty' if it is 'in the nature of punishment for the nonperformance of an act or for the performance of an unlawful act.' . . . [A] penal statute requires the transgressor to pay a penalty without regard to proof of any actual monetary injury . . . ." (citations omitted)). Further, the purpose to which a fine or penalty is put is unrelated to whether that payment is a fine or penalty. *See Mortenson v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 249 F.3d 667, 671–72 (7th Cir. 2001) (finding that the definition of a statutory assessment as a "penalty" controlled for purposes of insurance policy, regardless of whether the purpose of the assessment was to punish). Finally, Diamond cites the Illinois Supreme Court's definition of "damages" as "money one must expend to remedy an injury for which he or she is responsible." *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 607 N.E.2d 1204, 1216 (Ill. 1992). But as described above, Diamond paid a fine under a fine-authorizing statute to an agency with no authority to collect remedial or compensatory damages. Thus, Diamond's payment did not constitute "damages" within the meaning of the definition Diamond urges and certainly did not meet the definition of the contract term "Damages" as defined by the E&O Policy.

In short, Diamond has not adequately pleaded a claim upon which relief can be granted because the only reasonable inference the Court can draw from the pleadings is that the payment at issue was a fine and a penalty.

### C. Exclusion of Claims by Government Agencies

Liberty also contends that Diamond has not stated a claim for coverage under the E&O Policy because the policy excludes claims brought by government agencies.

Per Exclusion (N), "[the E&O Policy] does not apply to and [Liberty] shall not be liable for Damages and/or Claims Expenses resulting from any Claim made against an Insured . . . brought by or on behalf of any federal, state or local government or agency, or bureau thereof." (E&O Policy § 4(N).) The IDFPR and the Illinois Attorney General's Office are both government agencies. So, even if the fine paid by Diamond could be classified as a "Claim" under the policy, Exclusion (N) would exclude coverage. Once again, the usual rule that a pleading party need not plead around affirmative defenses does not exempt this issue from consideration because Diamond has pleaded facts that establish the coverage exclusion.

Diamond relies on an exception to Exclusion (N): "[T]his exclusion shall not apply to the extent an Insured is alleged to have provided Professional Services directly to any of the foregoing [federal, state, or local government or agency] as a customer or client." (*Id.*) Ultimately, Diamond would have the burden at trial of showing that the "government client" exception clause within Exclusion (N) applies. *Santa's Best Craft, LLC*, 611 F.3d at 347 (once insurer has established that exclusion applies, insured bears burden of proving exception to exclusion). At the pleading stage, Diamond normally would not have to anticipate the affirmative defense provided by the exclusion and allege facts to support an exception. But here,

9

Diamond's own Complaint establishes that Exclusion (N) applies, and it provides no additional facts to bring Diamond's claim within the exception.

Nonetheless, Diamond contends that the "government client" exception to Exclusion (N) applies because Diamond serves other government entities as clients. Under Diamond's interpretation, Exclusion (N) would initially exclude insured parties from coverage for government fines and investigations, but an insured party could defeat the exclusion simply by selling any insurance product to a single government client, whether or not that government entity had any connection to the fine or investigation. The Court does not find this to be a plausible reading of Exclusion (N), because such an exception would swallow the rule—*i.e.*, the exclusion—whenever an insured party had a single government client. Instead, the "government client" exception clearly and unambiguously addresses the limited situation where a government entity is the client of the insured and brings a Claim of its own against the insured. Diamond does not contend that to be the case here.

Finding no ambiguity in the applicable E&O Policy language, the Court concludes that Diamond has not adequately stated a claim upon which relief can be granted.

## II.  The Fidelity Bond

Liberty argues that the Fidelity Bond does not cover Diamond's loss because (1) Diamond did not provide adequate notice or proof of loss, and (2) the loss did not result "directly from" an employee's fraudulent acts.

### A.  Notice and Proof of Loss

The Bond requires Diamond to provide notice of loss within 60 days of its discovery, and "proof of loss, duly sworn to, with full particulars" within six months. (Bond § 2(G)(5).) Diamond has pleaded that on March 9, 2018, it gave notice of a loss under the Bond by email to

10

Liberty. (Compl. ¶ 8.) Although Diamond acknowledges that it did not provide "proof of loss" within six months, the amount of the loss was not fixed until the Consent Order was finalized in October 2018. (*Id.* ¶ 37.) In Illinois, the failure to provide sworn proof of loss within the time requirements of an insurance policy can relieve the insurer of liability. *See Tarzian v. W. Bend Mut. Fire Ins. Co.*, 221 N.E.2d 293, 299 (Ill. App. Ct. 1966). However, an insurer can waive the proof of loss requirement by not enforcing strict compliance or by denying coverage on other grounds. *Id.* at 326–27 (citations omitted.) And here, Diamond has pleaded that "[Liberty] had notified Diamond Mortgage that it had paid $10,000 and that no additional coverage was forthcoming, so that any further communication with Defendant would have been futile." (Compl. ¶ 34.)

The Court concludes that there is a question of fact as to whether Diamond provided adequate and timely notice and proof of loss and whether Defendant waived proof of loss. *See Ahrens Contracting, Inc. v. Pac. Ins. Co.*, No. 07-CV-387-WDS, 2008 WL 686984, at *2 (S.D. Ill. Mar. 13, 2008) (describing dispute regarding adequacy of proof of loss as "a summary judgment issue, at best, if not a jury question."); *Univ. of Ill. v. Cont'l Cas. Co.*, 599 N.E.2d 1338, 1354 (Ill. App. Ct. 1992) ("Generally, the timeliness of the notice given pursuant to a policy provision is a question of fact for the trier of fact, although it may be decided by the court if no genuine issue of material fact exists." (citation omitted)). These factual disputes are not appropriately resolved on the present motion, and accordingly the Court finds that Liberty is not entitled to dismissal on that ground.

### B. Coverage

Diamond claims coverage under a section of the Bond indemnifying Diamond for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in

11

collusion with others." (Bond, § 1(A). Dkt. No. 1-1.) At issue is whether Diamond's loss resulted *directly* from employee misconduct. Here, the branch manager's misconduct caused losses to lenders, which led to an investigation by IDFPR, which then led to a fine being imposed against Diamond. Although the branch manager's actions may have been the proximate cause of Diamond's losses, Diamond's losses were not directly caused by the branch manager, but instead by IDFPR. *RBC Mortg. Co. v. Nat'l Union Fire Ins.*, 812 N.E.2d 728, 737 (Ill. App. Ct. 2004) ("[Direct loss] is a much narrower concept than 'proximately caused loss.' This is because a proximate cause 'need not be the sole cause nor the last or nearest cause . . . .'" (citation omitted)). Because Diamond's losses stemmed from losses to third parties and a subsequent government investigation, Diamond's losses did not result "directly from" employee misconduct and are not covered under the Bond. *See id.* at 733 ("If an employee's dishonesty causes losses to a third party, which then leads to litigation concluding in a judgment or settlement, the insured has not incurred a 'direct loss' under a fidelity bond; the insured's loss is 'indirect' and the third party's loss is 'direct.'"). The Bond's terms are unambiguous as written in light of *RBC Mortgage* holding. *See Turner v. City of Chicago*, 979 F.3d 563, 571 (7th Cir. 2020) (explaining that when interpreting state law, it is appropriate to look at authority from state intermediate appellate courts "unless there are persuasive indications that the state supreme court would decide the issue differently"); *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court.") Diamond urges that *RBC Mortgage* should be read to apply only to cases involving

third-party investors, but the decision invites no such distinctions and deals squarely with the contract language at issue here.

It is true, as Diamond notes, that the Bond contemplates third-party liability in its claim discovery clause. (*See* Bond, § 2(G)(3).) But because the Bond contains fifteen different insuring agreements, some of which cover third-party claims, there is no reason to conclude that the discovery clause expands the breadth of "direct losses." (*See id.* §§ 1(N), 1(O).) And the Court has not identified or been presented with Illinois authority that supports the broader definition of "direct loss" for which Diamond argues. Diamond cites *Patrick Schaumburg Automobiles, Inc. v. Hanover Insurance Co.*, 452 F. Supp. 2d 857 (N.D. Ill. 2006), which does not conflict with the holding in *RBC Mortgage*. In *Schaumburg Automobiles*, an employee stole from his employer by buying used cars at greater than market value and selling cars for less than they were worth; the court held that these actions caused a direct loss to the employer. *Id.* at 861, 874. That case does not resemble the present dispute, where an employee's illegal actions led to an investigation and a fine from a government agency. While Liberty could have more exhaustively defined the meaning of "directly caused," its failure to do so creates no ambiguity. *Cf. Mortenson*, 249 F.3d at 671("[T]he possibility of making an insurance policy clearer doesn't imply that it is unclear in its present form.").

As the language of the Bond is unambiguous, the Court determines losses for which Diamond seeks compensation under the Bond did not result directly from its employees' misconducts. Therefore, the Court dismisses Count Two with prejudice.

## CONCLUSION

For the reasons provided above, Liberty's motion to dismiss (Dkt. No. 20) is granted. Although Diamond has not pleaded facts that would allow this Court to draw the reasonable

inference that Liberty breached its obligations under the E&O Policy or the Bond, the Court cannot rule out the possibility that Diamond could amend the Complaint to allege facts supporting a claim. Accordingly, the Court dismisses the Complaint without prejudice. Diamond is granted leave to file an amended complaint that addresses the deficiencies of discussed in this opinion by December 21, 2020. If it declines to do so, the Complaint will be dismissed with prejudice and final judgment will be entered.

ENTERED:

Dated: November 30, 2020

_____

Andrea R. Wood
United States District Judge