IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Diamond Residential Mortgage Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>Liberty Surplus Insurance Corporation,<br><br>        Defendant. | No. 19 CV 06439<br><br>Honorable Nancy L. Maldonado |

## MEMORANDUM OPINION AND ORDER

Plaintiff Diamond Residential Mortgage Corporation ("Diamond") provides mortgage loans to consumers in Illinois and several other states. In March 2018, the Illinois Department of Financial and Professional Regulation ("IDFPR") commenced an investigation into Diamond's Springfield, Illinois office and its employees' allegedly fraudulent practices. The investigation ultimately resulted in a Consent Order and an Assurance of Voluntary Compliance between Diamond, the IDFPR, and the Attorney General of the State of Illinois, requiring Diamond to pay $1,275,000 pursuant to Section 4-5(h)(5) of the Residential Mortgage License Act of 1987 ("Mortgage Act"). 205 ILCS 635/4-5(h)(5). Diamond notified Liberty Surplus Insurance Corporation ("Liberty"), which had issued Diamond a Professional Liability Mortgagee's Errors and Omissions Policy ("E&O Policy"), of a claim in March 2019. Liberty acknowledged receipt of the notice and paid Diamond $10,000 for attorneys' fees Diamond incurred, but subsequently denied Diamond's request for coverage of the $1,275,000 payment.

On September 27, 2019, Diamond filed its initial Complaint against Liberty for coverage (Dkt. 1), which was followed by Liberty's first motion to dismiss. (Dkt. 20.) This Court granted Liberty's motion, dismissing one claim with prejudice and dismissing Diamond's E&O Policy

claim without prejudice. (Dkt. 36.) Diamond has now filed its First Amended Complaint ("FAC") (Dkt. 37), and Liberty asks the Court to dismiss the remaining claim for a second time. (Dkt. 42.) Diamond has also filed a motion for leave to file a Second Amended Complaint ("SAC"). (Dkt. 55.) For the reasons that follow, Liberty's motion to dismiss is granted, and Diamond's motion for leave to file a SAC is denied. The case is therefore dismissed with prejudice.

## Background

For purposes of Liberty's present motion to dismiss, the Court accepts all well-pleaded factual allegations in the FAC as true and draws all reasonable inferences from those allegations in Diamond's favor as the non-moving party. *See Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as follows.

Around March 2018, the IDFPR opened an investigation into Diamond's Springfield, Illinois branch office. (Dkt. 37 ¶ 13.) Through its investigation, the IDFPR determined that Diamond's Springfield employees had fraudulently originated loans, and that Diamond had negligently supervised the office. (Dkt. 37-5 at 3.)[1] The IDFPR also found that the Springfield office's branch manager had diverted borrowers seeking home loan refinancing through Diamond to personal financial transactions with himself. (*Id.*) On March 7, 2018, the IDFPR suspended the Springfield office's license. (Dkt. 37-2 at 4.) And the Attorney General of the State of Illinois also began an investigation regarding Diamond's Springfield office. (FAC ¶ 18.)

On September 19, 2018, the IDFPR sent Diamond a letter with terms that would resolve IDFPR's "enforcement case." (Dkt. 37-3 at 2.) Among its terms, the IDFPR sought for Diamond to "pay a fine to IDFPR of $1,275,000 for 10 fraudulent loans in the Factual Findings at maximum $75,000 each as authorized under [the Mortgage Act] and $525,000 for 21 other

---

[1] In citations to the docket, page numbers are taking from the CM/ECF header.

violations by [Diamond] detailed within the Factual Findings at maximum of $25,000 each as authorized under [the Mortgage Act]." (*Id.* at 3.) Factual findings in the letter explained that the IDFPR's investigation had identified numerous loans with fraudulent or falsified documentation "as originated, processed, and underwritten by [Diamond] to fulfill Federal Housing Administration (FHA), Veterans Administration (VA), Fannie Mae (FNMA) and investors' conditions to secure loans for borrowers." (*Id.* at 4, ¶ 6.) The terms did not include a provision for a consumer remediation process. (Dkt. 37 ¶ 20.)

Diamond alleges that it rejected the terms in the IDFPR's letter and, instead, negotiated with the IDFPR and the Attorney General "to resolve all claims, including all civil claims that could have been brought against Diamond." (*Id.* ¶¶ 33–34.)

On October 23, 2018, Diamond entered a "Consent Order" with the IDFPR in which Diamond "agree[d] to pay $1,275,000 in settlement pursuant to Section 4-5(h)(5) of the [Mortgage Act]" ($75,000 to IDFPR and $1.2 million to the Attorney General's consumer claims process), to have its Springfield office's residential mortgage license placed on probation, and to comply with various other provisions. (Dkt. 37-5 at 5–6.) Diamond also agreed not to file any petition for administrative hearing or judicial review of the Consent Order. (*Id.*)

Alongside the Consent Order, Diamond entered an "Assurance of Voluntary Compliance" with the Attorney General, which stated that the IDFPR would transfer "fine monies" received from Diamond to the Attorney General's Consumer Trust Account for a compensatory consumer claims process. (Dkt. 37-6 at 3.) In return, the Attorney General released and discharged Diamond from all civil claims that would have otherwise amounted against Diamond pursuant to this investigation. (Dkt. 37-6 at 4.)

3

At all times relevant to this action, Liberty insured Diamond through an Errors and Omissions Policy ("E&O Policy"). (Dkt. 37 ¶ 8.) On March 9, 2018, after commencement of the IDFPR's investigation, Diamond notified Liberty of its claim under the E&O Policy. (*Id.* ¶ 47.) Liberty acknowledged receipt of the notice on March 13, 2018, and paid $10,000 to Diamond for attorney's fees related to the investigation. (*Id.* ¶ 48.) Liberty subsequently denied that the E&O Policy provided any additional coverage to Diamond because the terms of the E&O Policy did not extend coverage to the loss in question. (*Id.* ¶ 49.)

In its original complaint against Liberty, Diamond claimed breach of two different policies of insurance—the E&O Policy and a bond policy. On January 6, 2020, Liberty filed a motion to dismiss for failure to state a claim. (Dkt. 20.) This Court granted Liberty's motion, dismissing Diamond's bond policy claim with prejudice, and dismissing Diamond's E&O Policy claim without prejudice. (Dkt. 36.) Specifically, the Court dismissed Diamond's E&O Policy claim because the Court could only draw reasonable inferences that the loss at hand did not meet the definition of a claim; that the exclusion of coverage for fines and penalties applied; and that Exclusion (N), barring coverage for claims brought by government agencies, also applied. (*Id.* at 4–10.) The Court left open the possibility that Diamond could amend its complaint to allege facts supporting a claim. (*Id.* at 14.)

A month later, Diamond filed the FAC, adding allegations as to its claim that Liberty breached the E&O Policy. (Dkt. 37.) Liberty responded with the instant motion to dismiss the FAC. (Dkt. 42). While the motion to dismiss was pending, Diamond also filed a motion for leave to file a Second Amended Complaint ("SAC"). (Dkt. 55.) Diamond states that, in the time since it filed its FAC, one of its former employees at the center of the underlying IDFPR investigation has now pleaded guilty to several counts of wire fraud. Diamond contends that the facts related to this

4

employee's guilty plea provide further support for its claims, and undercut defendant's arguments for dismissal. Diamond therefore seeks leave to file a SAC to add additional allegations related to this criminal case and the former employee's plea.

## Discussion

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *See Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). With respect to motions to amend, Rule 15(a)(2) provides that the Court "should freely give leave" to a party to file an amended pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts, nevertheless, have "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). An amendment is futile if the amended pleading would not survive a motion to dismiss. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014).

As stated in this Court's previous Opinion, "[u]nder Illinois law, construction of insurance policies is a question of law." (Dkt. 36 at 3–4 (quoting *Keystone Consol. Indus., Inc. v. Emp'rs Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006)).) In terms of analysis, the Seventh Circuit has explained that, as with contracts, "Illinois courts aim to ascertain and give effect to the

5

intention of the parties [of an insurance policy], as expressed in the policy language, so long as doing so does not contravene public policy." *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011) (citations omitted). Further, a court "will not search for ambiguity where there is none." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 800 N.E.2d 307, 314 (Ill. 2006).

With its motion to dismiss the FAC, Liberty argues that even with its new allegations Diamond still fails to state a claim for the same reasons outlined in this Court's previous Memorandum Opinion and Order. In particular, Liberty contends that (1) Diamond's loss does not meet the definition of a claim; (2) Diamond paid a fine or penalty excluded from coverage; and (3) that Exclusion (N) applies. With respect to Diamond's motion for leave to amend, Liberty argues that Diamond's proposed SAC is untimely, unfairly prejudicial, and regardless, would be futile as it does not change the outcome with respect to any of Liberty's arguments for dismissal of the FAC.

The Court will consider each of Liberty's arguments in turn below. The Court ultimately concludes that Liberty's motion to dismiss the FAC should be granted on each off the three grounds cited in its motion. Further, the Court agrees with Liberty that Diamond's proposed SAC would be futile.

I. **Claim Versus Disciplinary Proceeding**

Liberty argues that the loss outlined in Diamond's FAC continues to describe a disciplinary proceeding; not a claim. (Dkt. 43 at 13.) This distinction is important: Liberty indemnifies "Damages and Claims Expenses resulting from Claims" but not losses from disciplinary proceedings. (Dkt. 37-1 at 6.) The E&O Policy defines a claim as "a written demand for monetary relief [or] . . . a civil action, suit or arbitration proceeding commenced by service of a complaint or similar pleading." (*Id.* at 10.) It then defines a disciplinary proceeding as "any

proceeding commenced by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct in the performance of Professional Services." (*Id.* at 12.) "Professional Services" covers various activities, including loan origination. (*Id.* at 15.) Above all, the E&O Policy clarifies that a "Claim shall not mean a Disciplinary Proceeding." (*Id.* at 11.)

In considering the allegations in the original Complaint, the Court concluded that Diamond had failed plausibly to allege that Diamond's loss resulted from a claim eligible for coverage:

> The contract language is unambiguous, identifying a limited set of circumstances that constitute a Claim. But Diamond's Complaint does not include any facts supporting a reasonable inference that the IDFPR or the Attorney General ever presented Diamond with a written demand for monetary relief or initiated a civil action, suit, or arbitration proceeding.

(Dkt. 36 at 5.) Nonetheless, the Court invited Diamond to allege more specific facts so that the Court could defer to Diamond's pleadings. (*Id.*)

In response, Diamond amended its FAC to allege that the IDFPR's September 19, 2018, letter to Diamond was a "written demand" for $1,275,000 and that a written demand falls under the definition of a claim. (Dkt. 37 ¶¶ 19–20.) Specifically, Diamond alleges that the IDFPR made a written demand for monetary relief that included terms for Diamond to avoid enforcement actions by the IDFPR or a civil action by the Attorney General. (*Id.* ¶ 19.) Diamond argues that the IDFPR's investigation became a claim once the IDFPR sent its written demand to Diamond (Dkt. 44 at 11), and that nothing in the E&O Policy states that a disciplinary proceeding cannot become a claim at a later point. (*Id.* at 12) ("[E]ven if the IDFPR's initial investigation is properly characterized as a Disciplinary Proceeding, there is nothing in the Policy requiring that the initial character of the proceeding forever control the coverage question.").

7

Despite Diamond's new allegations, however, the language in the E&O Policy remains unambiguous. The policy language that a Claim is not a disciplinary proceeding means exactly what it says. "Ambiguity exists only if the term is susceptible to more than one reasonable interpretation." *Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd*, 860 N.E.2d 280, 286 (Ill. 2006). The Court is not convinced by Diamond's stretching of the E&O Policy's language, nor has Diamond added more than conclusory statements to its FAC. (*See, e.g.*, Dkt. 37 ¶ 19) (labeling the IDFPR's September 2018 letter as a "written demand" even though the term does not appear anywhere in the document). And while Liberty could have worded its E&O Policy differently, the E&O Policy language regarding coverage for claims (which does not include disciplinary proceedings) is clear. *See Mortenson v. Nat'l Union Fire Ins. Co.*, 249 F.3d 667, 671 (7th Cir. 2001) ("[T]he possibility of making an insurance policy clearer doesn't imply that it is unclear in its present form."). The Court determines that Diamond's loss, brought on by a regulatory agency's investigation, is consistent with a disciplinary proceeding and therefore not covered by Liberty's E&O Policy.

The later Consent Order itself supports the Court's interpretation. As Liberty notes, the Consent Order in which Diamond agreed to pay $1,275,000 to the IDFPR and the Attorney General marks the end of the IDFPR's investigation, and the Order states as much. (Dkt. 45 at 5.) The IDFPR states, and Diamond agrees in signing the Consent Order, that the IDFPR has "now concluded its investigation." (Dkt. 37-5 at 3, ¶ 3.) The Consent Order also includes a caption for the IDFPR's administrative proceeding, *In the Matter of Diamond Residential Mortgage Corporation*, found in earlier exhibits like the March 7, 2018 Emergency Order suspending Diamond's Springfield operations. (*See* Dkts. 37-2, 37-5.) Evidently, the investigation could not

8

have concluded at the time of the IDFPR's September 2018 letter, and the letter therefore did not serve to convert the investigation from an uncovered disciplinary proceeding into a covered claim.

Pursuant to the E&O Policy and the relevant exhibits, the only reasonable inference to be drawn from the FAC is that Diamond's loss falls within the definition of a disciplinary proceeding and therefore is not covered by the Policy. This finding is dispositive as to coverage and is grounds on its own to grant the motion to dismiss. The Court will nevertheless analyze the remaining issues Liberty raises regarding the type of payment and applicability of Exclusion (N).

## II.     Damages Versus Fine or Penalty

Liberty also argues in its motion to dismiss that the $1,275,000 Diamond paid pursuant to the Consent Order constituted a fine or penalty, rather than damages that would be covered under the E&O Policy. As noted above, the E&O Policy indemnifies Diamond for "Damages and Claims Expenses resulting from Claims." (Dkt. 37-1 at 10.) The Policy defines damages as "judgments (inclusive of any pre- or post-judgment interest), [and] awards or settlements negotiated with the approval of the Company." (*Id.* at 11.) The definition also states that damages *do not* include "civil or criminal fines or penalties." (*Id.*)

In ruling on Liberty's previous motion to dismiss, this Court drew the reasonable inference that Diamond's payment of $1,275,000 constituted a fine or penalty, and therefore was not covered under the E&O Policy. The Court based its determination on the IDFPR's authorizing statute and language found in the Consent Order between Diamond and the IDFPR, as well as in the Assurance of Voluntary Compliance entered into between Diamond and the Attorney General of Illinois. To start, the Consent Order between the IDFPR and Diamond states that the term of payment is "pursuant to Section 4-5(h)(5) of the [Mortgage Act]." (Dkt. 37-5 at 6.) Section 4-5(h)(5) of the Act allows the Commissioner of the IDFPR to impose penalties of up to $25,000 for

9

each offense, or up to $75,000 for each offense involving fraud and other mortgage financing misconduct. 205 ILCS 635/4-5(h)(5); (Dkt. 36 at 7.) On the other hand, this section of the Mortgage Act *does not* authorize compensatory or remedial damages. *Id.* Further, the Court pointed to language in the Assurance of Voluntary Compliance that noted the IDFPR would transfer "*fine monies* received from DIAMOND" to the Attorney General's Consumer Trust Account. (Dkt. 36 at 7; Dkt. 37-6 at 3.) The Court also rejected Diamond's argument that its payment should be considered damages because it went, in part, to a victim-compensation fund, which it argued was not consistent with the typical understanding of what constitutes a "fine." The Court noted that "the purpose to which a fine or penalty is put is unrelated to whether that payment is a fine or penalty." (Dkt. 36 at 8) (citing *Mortenson*, 249 F.3d at 671–72). The fact that some of the money Diamond paid ultimately went to a victim compensation fund did not change the characterization of that payment as a fine or penalty, which the Court found it plainly was under the language of relevant IDFPR documents and the underlying statute.

Now in the FAC, Diamond offers new allegations that its payment was part of a "negotiated settlement" that falls under the E&O Policy's definition of damages. (Dkt. 37 ¶¶ 33–44.) According to Diamond, "[a]fter receiving the [September 2018 letter from the IDFPR], Diamond Mortgage, the IDFPR, and the Attorney General engaged in negotiations to resolve all claims" and "reached a settlement" on October 23, 2018, by way of the Consent Order and Assurance of Voluntary Compliance. (*Id.* ¶¶ 34–35.) Diamond argues that the parties' "mutually beneficial settlement" allowed for the compensatory claims process, which would act as compensatory damages for victims; not a fine or penalty. (Dkt. 44 at 17–18.)

The Court's prior holding that this payment was a penalty, not damages, still applies despite Diamond's new attempt to recharacterize the payment as a "settlement." In other words,

10

this Court's prior determination that Diamond paid a fine—which was based on language from the authorizing statute, Consent Order, and Assurance of Voluntary Compliance—stands, despite Diamond's new allegations describing the agreement with IDFPR as a settlement. The FAC still does nothing to overcome the fact that Section 4-5(h)(5), referenced in the Consent Order, only authorizes penalties, or that the calculation for penalties in the statute is the same as that of the Consent Order. 205 ILCS 635/4-5(h)(5) ("Imposition of a fine not to exceed $25,000 for each count of separate offense, provided that a fine may be imposed not to exceed $75,000 for each separate count of offense of paragraph (2) of subsection (i) of this Section . . . ."). Moreover, the alleged settlement terms referenced in the Consent Order are nearly identical to those outlined in the IDFPR's September 2018 letter, which describes the $1,275,000 payment Diamond was to make as a "fine" pursuant to the Mortgage Act. (Dkt. 37-3 at 3.)[2] Even taking the allegations describing the agreement as a settlement as true, the Court's view remains the same: "Diamond paid a fine under a fine-authorizing statute to an agency with no authority to collect remedial or compensatory damages." (Dkt. 36 at 8.)[3]

In addition to its new arguments characterizing its payment as a "settlement," Diamond also argues, for a second time, that the claims process established by the Consent Order is indicative of damages. But again, as the Court previously held, "the purpose to which a fine or penalty is put is unrelated to whether that payment is a fine or penalty." (*Id.*) Therefore, as other courts have also held in similar coverage disputes, the establishment of a claims process does not

---

[2] The main difference between the two documents is that the Consent Order includes a term that lays out the consumer claims process, though the IDFPR's September 2018 letter does not make mention of such a process. (*Compare* FAC, Ex. 3, Dkt. 37-3, *with* FAC, Ex. 5, Dkt. 37-5.)

[3] Liberty also notes correctly that Diamond must prove that it "settled an otherwise covered loss in reasonable anticipation of liability of coverage" for the duty to indemnify to apply. (Dkt. 45 at 10) (quoting *Selective Ins. Co. v. Target Corp.,* 845 F.3d 263, 270–71 (7th Cir. 2016)). Therefore, a settlement involving a disciplinary proceeding, which is not covered under the policy, would not trigger indemnification.

change the nature of a payment from that of an uncovered fine or penalty. *See, e.g.*, *Cont'l Cas. Co. v. Duckson*, 826 F. Supp. 2d 1086, 1098 (N.D. Ill. 2011) (holding, in a case involving a policy that similarly excluded civil penalties from coverage, that the "creation of a [claims process] does not change the essential nature or measurement of a civil penalty or disgorgement of ill-gotten gains").[4] Diamond's allegations and arguments regarding the claims process do not change the Court's position that Diamond's payment was a fine.

Diamond also raises an argument that, assuming *arguendo* that its payment entailed a fine or penalty, three requirements of a fine under the Mortgage Act were not met: (1) that Diamond receive notice of the IDFPR's intent to issue a fine; (2) that Diamond have the right to a hearing to contest the fine; and (3) that the fines be deposited into the Residential Finance Regulatory Fund. (Dkt. 44 at 14–16.) But Diamond agreed to terminate its administrative rights under the Mortgage Act when it signed the Consent Order. (Dkt. 37-5 at 6) ("By executing this Consent Order, [Diamond] agrees to not file any petition for administrative hearing or judicial review of, or in connection with, this Consent Order . . . ."). Diamond thus contracted away its ability to contest the fine on the first two grounds above it attempts to raise now. As to the third argument, the Consent Order did in fact outline that the balance of Diamond's payments remaining after the claims process would go to the Residential Finance Regulatory Fund. (*Id.* at 5.) ("Any monies

---

[4] In a supplemental filing, Diamond points the Court to a decision from the New York Court of Appeals which it contends further supports its position that the establishment of a claims process renders its payment to the IDFPR as damages, and not a fine. (*See* Dkt. 50) (citing *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443 (N.Y. 2021)). There, the court ruled that a plaintiff's $160 million settlement with the SEC for "disgorgement" was not a "penalty" excluded from coverage under a policy, in part because the SEC established a consumer claims fund using the settlement. But the case is distinguishable and the Court finds it of no persuasive value to Diamond's arguments. The court in *Vigilant* based its determination that the settlement was made for compensatory purposes, not as a penalty, on the fact that the settlement value was measured based on the injured party's losses, and the improper gains of the wrongful party. *Id.* at 449. In other words, the amount was directly tied to compensating victims, and in fact there was evidence that the SEC arrived at the settlement amount based on a valuation of the injuries to investors. *Id.* at 450. Here however, as explained above, the $1,275,000 amount was determined based on the Mortgage Act's provisions for the calculation of *penalties* and was not tied to any valuation of compensation for victims. Indeed, as noted above, Section 4-5(h)(5) authorizes penalties and requires a definitive calculation of payment *without consideration* of victims' losses or wrongdoer's gains. The holding of *Vigilant* is therefore inapplicable here.

remaining after the distribution pursuant to the claims process shall be transferred to the Department, for deposit into the Residential Finance Regulatory Fund."). That payments would be deposited first to the Attorney General and then to the Residential Finance Regulatory Fund does not somehow change the character of the payments from a fine into damages.

In short, the Court finds no ambiguity in the E&O Policy language regarding the coverage for damages, and lack of coverage for fines or penalties. Taking the allegations in the FAC as true, the Court concludes that Diamond agreed to pay a fine or penalty pursuant to the Consent Order, and therefore the money it paid is exempted from coverage.

### III. Exclusion (N)

Lastly, Liberty contends that Exclusion (N) of the E&O Policy excludes claims brought by government agencies, such as in this case. (Dkt. 43 at 20–22.) The E&O Policy lists various exclusions of coverage, including (N), which states that the policy "does not apply to and [Liberty] shall not be liable for Damages and/or Claims Expenses resulting from any Claim made against an Insured . . . brought by or on behalf of any federal, state or local government or agency, or bureau thereof." (Dkt. 37-1 at 18, 21.) If Diamond's loss were a claim for damages—and not uncovered disciplinary proceedings or uncovered fines as the Court has found—it would still not be covered in light of Exclusion (N), because the claim was brought against Diamond by the IDFPR and Attorney General, state government agencies. (Dkt. 36 at 9.) Diamond attempts to get around this issue by arguing that one of the exceptions listed in Exclusion (N) also applies. The relevant exception states that Exclusion (N) shall not apply "to the extent an Insured is alleged to have provided Professional Services directly to any of the foregoing [federal, state, or local government or agency] as a customer or client." (Dkt. 37-1 at 21.) In arguing this issue in response to Liberty's first motion to dismiss, Diamond maintained that this exception to

13

Exclusion (N) applied, because Diamond generally serves other government entities as clients. (Dkt. 36 at 10.)

The Court disposed of this argument swiftly in its original Opinion, explaining that the exception to Exclusion (N) "clearly and unambiguously addresses the limited situation where a government entity is the client of the insured and brings a Claim *of its own* against the insured." (*Id.*) (emphasis added) It was thus irrelevant that Diamond had other government clients, because Diamond did not contend that the IDFPR or Attorney General brought a claim against Diamond on their own behalf. The Court thus concluded that the exception to Exclusion (N) did not apply, and the exclusion independently barred coverage for Diamond's claim, because it was brought by government entities. (*Id.*)

In the FAC, Diamond alleges that the exception to Exclusion (N) allows indemnification of claims brought by government entities where the government entities are "customers or clients" of the insured. (Dkt. 37 ¶ 61.) Diamond lists several government entities to whom it provides "Professional Services," including the United States Department of Housing and Urban Development, Ginnie Mae, the FHA, the VA, the United States Department of Agriculture, the Illinois Housing Development Association, and Fannie Mae. (Dkt. 37 ¶¶ 22–30.) Diamond goes on to allege that all of the loans at issue in the IDFPR's investigation were made under government lending programs and government lending guidelines. (Dkt. 37 ¶ 31.)

Diamond's additional allegations in the FAC do not compel the Court to deviate from its prior determination that Exclusion (N) applies, and that the exception covering government entities that bring a claim on their own behalf does not. The Court found that these portions of the E&O Policy were clear and unambiguous and only applied to situations where a government entity brings a claim *on its own behalf* (Dkt. 36 at 10). Yet Diamond makes no new allegations

14

that the IDFPR or Attorney General brought such a claim on their own behalf, and its allegations that the loans that were investigated by the IDFPR involved loans issued by *other* government entities or under government guidelines is simply not the equivalent of saying that the IDFPR and Attorney General were bringing a claim against Diamond *on their behalf* based on Professional Services *they received*. Instead of remedying this issue, Diamond spends several pages of its response brief simply arguing that Liberty's (and by extension, the Court's) interpretation of this policy provision is incorrect. (*See* Dkt. 44 at 22–24.) That is, Diamond maintains that the exception to Exclusion (N) does not require that the government entity bringing the claim be the same entity that Diamond served as a customer or client. The Court finds this rehashed argument unavailing, and it does not persuade the Court to deviate from its holding as to the meaning of the clear and unambiguous policy language. As the Court noted previously, Diamond's interpretation of the policy language would mean that "an insured party could defeat the exclusion simply by selling any insurance product to a single government client, whether or not that government entity had any connection to the fine or investigation." (Dkt 36 at 10.) Such an interpretation would, as the Court observed, "swallow the rule," or in other words, would render the exclusion inapplicable any time the insured had a single government client. (*Id.*). In short, the fact that Diamond had other government clients, or that the IDFPR investigated loans issued by the government or pursuant to government guidelines, does not trigger the exception to Exclusion (N). The exclusion thus applies to bar coverage.

In sum, the Court agrees with Liberty on all three of its grounds for dismissal of the FAC: Diamond's loss arose from an uncovered disciplinary proceeding, its losses were uncovered fines, and Exclusion (N) applies to bar coverage. The Court therefore grants Liberty's motion to dismiss the FAC.

15

### IV. Diamond's Motion for Leave to File Second Amended Complaint

Having found the FAC should be dismissed, the Court turns next to Diamond's request for leave to file a SAC. (Dkt. 55.) Diamond maintains that there have been additional factual developments that provide further support for its claims, in particular in support of its arguments that the exception to Exclusion N discussed above is satisfied.

Specifically, Diamond's proposed SAC seeks to add a few additional allegations discussing developments in the criminal prosecution of its former employee, Christopher Schaller. (*See* Dkt. 55-1, SAC.) The FAC indicated that Schaller was indicted in federal court in September 2019 on charges related to six of the loans that were subjects of the IDFPR investigation into Diamond. (Dkt. 37 ¶ 32.) The SAC seeks to add the allegation that, on June 13, 2022, the U.S. District Court for the Central District of Illinois entered a criminal judgment against Schaller on six counts of wire fraud associated with those six Diamond loans. (Dkt. 55 ¶ 33.) The judgment included an order that Schaller pay restitution to Diamond and the VA for "their losses associated with Schaller's misconduct in originating the loans for [Diamond] as client of the Federal Housing Administration, the Veteran's Administration or the United States Department of Agriculture." (*Id.*) According to the SAC, the Central District Court found that Diamond was "one of the primary victims" of Schaller's criminal conduct. (*Id.*). The SAC also adds allegations describing a press release from the Department of Justice in connection with the Schaller conviction, in which the DOJ, in describing the background of the conviction, stated that "IDFPR and Diamond entered into a consent order where Diamond agreed to pay $1,275,00 to settle all allegations." (*Id.* ¶ 46.)

Diamond argues that these additional allegations support its contention that the exception in Exclusion (N) discussed above—that the exclusion does not apply where Diamond is alleged to

16

have provided Professional Services to a government agency as a customer or client—applies and therefore Exclusion (N) does not bar coverage. (Dkt. 55 at 4–5.) Diamond points to the Court's prior concern, noted above, that Diamond's interpretation of the policy would mean that "an insured party could defeat the exclusion simply by selling any insurance product to a single government client, whether or not that government entity had any connection to the fine or investigation. (Dkt. 36 at 10.) Diamond contends that the additional allegations in the SAC remedy this issue by demonstrating a connection between the services Diamond offered to the government, and the IDFPR investigation. As Diamond sees it, the court order that Schaller pay restitution to both Diamond and the VA as victims of the same fraudulent loan, demonstrates that the IDFPR investigation is connected to Diamond's professional services provided to government entities (such as the VA) as clients. Separately, Diamond contends that the language in the DOJ press release—stating that Diamond and IDFPR agreed to "settle all allegations"—supports its contention that the loss it incurred was a negotiated settlement for damages, and not a fine. (Dkt. 55 ¶ 46.)

An initial issue with Diamond's proposed amendment is that it fails to address the Court's finding that Liberty is entitled to dismissal on another independent ground, that the IDFPR investigation was a disciplinary proceeding, which is not covered under the E&O Policy. It makes no difference to the ultimate disposition of this case if Diamond adds allegations related to the application of Exclusion (N) or identifying its payment as a "settlement," because the SAC would still fail to state a claim for relief on the grounds that Diamond's losses arose from a disciplinary proceeding. Diamond's proposed amendment is therefore futile on these grounds alone, and the Court could deny the motion for leave to amend outright without need to address the merits of Diamond's other additional allegations.

In the interest of completeness, however, the Court addresses Diamond's arguments on the merits. The Court ultimately concludes that the additional allegations in the SAC do not compel the Court to reach a different conclusion on the applicability of Exclusion (N), or that Diamond's loss was a fine or penalty uncovered by the policy. Taking the latter issue first, the Court has already explained above that describing Diamond's agreement with the IDFPR as a "settlement" does not change the fact that the money Diamond paid is properly understood as a fine. It is therefore of no moment that the DOJ also suggested in a press release that Diamond's money payment was made "to settle allegations." As discussed above, the language from the authorizing statutes, Consent Order, and Assurance of Voluntary Compliance, all demonstrate that the money Diamond paid was a fine and is therefore not covered by the E&O Policy. The DOJ press release does not impact this determination.

With respect to the exception to Exclusion (N), as noted above, the Court has held that the exception "clearly and unambiguously addresses the limited situation where a government entity is the client of the insured and brings a Claim of its own against the insured." (Dkt. 36 at 10.) Diamond appears to contend that, since the VA was found to be a victim of Schaller's conduct in originating the fraudulent loans which were the subject of the IDFRP investigation, the IDFRP's investigation was an action against Diamond based on services provided to a government entity as a customer, i.e., the VA, and therefore the exception to Exclusion N applies. But this argument amounts to nothing more than a rehashing of Diamond's dispute with the Court's interpretation of the unambiguous policy language. No matter how many times and how many ways Diamond seeks to argue otherwise, the exception to Exclusion (N) only applies where a government entity brings a claim against Diamond *on its own behalf* based on services *it received*. Even if the Court accepted Diamond's framing of the Central District of Illinois judgment as somehow reflecting

18

that the IDFRP was bringing a claim *on behalf of the* VA as a victim, this would not save Diamond's claim, because there is no contention that the IDFPR was bringing a claim on its own behalf. The fact that the IDFPR was bringing claims based on loans that were made as part of government programs simply does not equate to the IDFPR bringing its own claims. The IDFRP did not receive any services from Diamond as a customer, and did not bring its investigation on its own behalf in connection with those services. The exception therefore does not apply.[5]

In sum, the additional allegations in the SAC do not save Diamond's claim. The SAC would therefore be futile, and Diamond's motion to amend is therefore denied. Because of the Court's resolution of this issue, it need not also determine whether the amendment is untimely, or whether it would be unfairly prejudicial.

## CONCLUSION

For the foregoing reasons, Liberty's motion to dismiss Diamond's First Amended Complaint is granted, and Diamond's motion for leave to file a SAC is denied The Court dismisses Diamond's remaining claim with prejudice.

---

[5] There are other issues with Diamond's contentions, such as the fact that the criminal investigation in the Central District of Illinois is an independent federal criminal prosecution distinct from the state level IDFPR investigation. That federal prosecutors independently brought charges against Schaller, and a federal court independently identified the VA as a victim, provides no reasonable inference that the IDFPR was actually bringing its claim against Diamond on behalf of the VA or the other government clients whom Diamond serviced. Nor does Diamond even directly allege as much. Indeed, as Liberty points out in its reply, the Consent Order itself suggests that the IDFPR was conducting the investigation, and entering into an agreement, in the "best interests of the people of the State of Illinois," not on behalf of any other government client. (Dkt. 37-5 at 6.) In any event, Diamond's claims regarding other government agencies or entities are ultimately irrelevant, as again, there is no claim that the IDFPR was bringing the investigation based on services that it received from Diamond.

ENTERED: 3/25/24

*Nancy L. Maldonado*
_____
Nancy L. Maldonado
United States District Court Judge